IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| ALDO DAVICO, Jr., | ) |
| Plaintiff, | ) Civ. No.05-6052-TC |
| vs. | ) |
| | ) FINDINGS AND |
| GLAXO SMITHKLINE PHARMACEUT- | ) RECOMMENDATIONS |
| ICALS, a foreign corporation, | ) |
| Defendant. | ) |

Coffin, Magistrate Judge:

Plaintiff, Aldo Davico, Jr., alleges that defendant terminated him in violation of Oregon Law. Defendant filed a motion for summary judgment on plaintiff's claims. The court held a hearing on the motion on July 24, 2007.[1] For the following reasons, the court recommends that defendant's motion for summary judgment be granted.

## STANDARDS

Summary judgment is appropriate where "there is no genuine issue as to any material fact and . . . the moving party is

---

[1] At the July 24, 2007 hearing, the court granted plaintiff's unopposed motion to dismiss two of his claims and ordered that Claim 1 and Count 2 of Claim 3 were dismissed. The parties agreed that this court retained jurisdiction of the remaining claims based on diversity under 28 U.S.C. § 1332.

1 Findings and Recommendations

entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The initial burden is on the moving party to point out the absence of any genuine issue of material fact. Once the initial burden is satisfied, the burden shifts to the opponent to demonstrate through the production of probative evidence that there remains an issue of fact to be tried. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Rule 56(c) mandates the entry of summary judgment against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. The moving party is "entitled to a judgment as a matter of law" because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof. Id. at 32. There is also no genuine issue of fact if, on the record taken as a whole, a rational trier of fact could not find in favor of the party opposing the motion. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S.Ct. 1348, 1355 (1986); Taylor v. List, 880 F.2d 1040 (9th Cir. 1989).

On a motion for summary judgment, all reasonable doubt as to the existence of a genuine issue of fact should be resolved against the moving party. Hector v. Wiens, 533 F.2d 429, 432 (9th Cir. 1976). The inferences drawn from the underlying facts must be viewed in the light most favorable to the party opposing

2 Findings and Recommendations

the motion. <u>Valadingham v. Bojorquez</u>, 866 F.2d 1135, 1137 (9th Cir. 1989). Where different ultimate inferences may be drawn, summary judgment is inappropriate. <u>Sankovich v. Insurance Co. of North America</u>, 638 F.2d 136, 140 (9th Cir. 1981).

### FACTUAL BACKGROUND

The parties are familiar with the factual background. Accordingly, the factual details will be set forth below only as they are relevant to the instant motion.

Plaintiff is of Brazilian national origin and is mixed race. Defendant Glaxo SmithKline (GSK) hired plaintiff as a senior pharmaceutical sales representative in February 2000. Plaintiff's job was to promote GSK products to physicians to influence their prescribing habits. Plaintiff promoted GSK's drug Wellbutrin, which is an anti-depressant for adults. The record reveals that plaintiff had, at best, a difficult relationship with his supervisors.

GSK had "commercial practice policies" (policies) to give their representatives a code of conduct and to advance GSK's goal of conducting business with high ethical standards. Plaintiff had access to the policies, but admits that he did not become familiar with them. Among other things, the policies prohibited sales representatives from promoting GSK drugs for off-label uses[2] (uses for which the Food and Drug Administration (FDA) had not approved the drug) and from giving gifts to physicians in return for purchasing or prescribing GSK products (this was also prohibited by anit-kickback laws). The policies required sales

---

[2] Off-label uses for Wellbutrin include obesity treatment, child and adolescent depression, and smoking cessation.

3 Findings and Recommendations

representatives to enter all of their calls daily. In early summer 2002, GSK revised its policies to impose more restrictions on expenditures and on entertainment.

In December 2001, plaintiff violated GSK's policies when he arranged to pay for the hairstyling appointment of a physician. Plaintiff was notified by GSK's human resources department that this was a violation; that it would be reported internally; and that it could be reported to the FDA.

In November 2002, several months after GSK imposed more restrictions on expenditures and entertainment, plaintiff complained to GSK's Human Resources department that his manager, Ismeal Acosta, had been singling him out for policy and procedures enforcement. Plaintiff perceived that, since mid-2002, Acosta had been scrutinizing his activities in a more restrictive manner.

Plaintiff was the best promoter of Wellbutrin in his sales group; however, plaintiff admits that, to achieve his number one ranking, he marketed Wellbutrin for off-label purposes. Plaintiff knew that off-label marketing was illegal and that it violated GSK's policies. Plaintiff asserts that, despite formally disavowing off-label marketing, GSK actually expected, and even rewarded, off label marketing.

Plaintiff met with at least one client at the Silver Dollar, a nude dancing establishment, and sought reimbursement from GSK for expenses incurred there. Plaintiff alleges that the visit was at the request of his client and that Acosta approved the expense "just [that] once." In May 2003, plaintiff sought

4 Findings and Recommendations

reimbursement for a dinner with a physician and female guests.[3] The dinner was unrelated to GSK's business and the request violated GSK's policies. When he did not receive reimbursement, plaintiff requested incentive compensation for this dinner by characterizing it as a business event, even though plaintiff later admitted in his deposition that characterization was not true.

On June 6, 2003, plaintiff filed an administrative charge alleging race and national origin harassment by his manager, Acosta. On June 9, 2003, plaintiff sent a letter to the FDA alleging that GSK was engaging in illegal off-label marketing practices.

In August 2003, Jim Lamb, a GSK regional vice-president received a letter from the Atlanta Hilton Hotel notifying GSK that plaintiff had caused a scene in the lobby when he arrived at the hotel to attend a GSK event. The letter detailed that plaintiff had become "very irate" and had used profanity with the hotel staff. The same month, plaintiff requested items to "give away to top clients in exchange for favors," which was in violation of GSK's policies. Plaintiff was reprimanded for this violation.[4]

---

[3] In his declaration, plaintiff states that he never requested payment for the dinner with Dr. Hogan. (Declaration of Aldo Davico, Jr. at ¶ 9.) Plaintiff's own evidence refutes this assertions. In e-mails contained in exhibit 9 to plaintiff's declaration show that he asked Acosta to pay for the dinner, and when Acosta refused, plaintiff asked other GSK managers to pay for the dinner.

[4] Although it is not material, plaintitff's characterization of this event is somewhat different. In his declaration he states that he "made a mistake and was too accurate in an e-mail while GSK was looking for an excuse to terminate [him]. Every expense for 'keeping

5 Findings and Recommendations

Plaintiff applied for another position, Neurohealth Clinical Specialist, with GSK in August 2003; being selected for the position would have been a promotion for plaintiff. Plaintiff was not selected for the position. Elnora Young Williams and Steve Sullivan, were the only two GSK employees involved in hiring for this position. Ms. Young-Williams stated that she selected another applicant because that applicant seemed "exceptionally well prepared." Ms. Young-Williams had no knowledge of plaintiff's June 2003 complaints against GSK.

Plaintiff was instructed on three occasions to complete an online training module for processing grant requests. Plaintiff refused to comply. In an August 2003 refusal, plaintiff told his manager Acosta, that Acosta should do it himself instead.

In September 2003, during a GSK regional meeting, plaintiff opened a newspaper while Acosta was addressing the group. Plaintiff did not put his newspaper away immediately after Acosta directed him to do so; plaintiff did eventually comply with Acosta's request.

Because of the friction between plaintiff and Acosta, plaintiff reported directly to Jim Lamb, the regional vice-president, for one month in September 2003. On September 29, 2003, Lamb sent plaintiff a memo which outlined several issues of concern and listed specific performance expectations. One of the performance expectations was that plaintiff would treat Acosta with respect and courtesy. Lamb sent plaintiff another memo on

---

them happy' to doctors is a camouflaged kickback, and sometimes [he] forgot to pretend that it was for some medical reason." (Declaration of Aldo Davico at ¶ 15.)

6 Findings and Recommendations

October 20, 2003 outlining additional items of concern relating to job performance and instructing plaintiff to work more cooperatively with Acosta, to refrain from using a contentious tone in communications, and to exhibit a high degree of professionalism and teamwork.

On October 28, 2003, plaintiff met with Acosta for a ride-along work session. Just prior to beginning the ride-along, Acosta was served with process for a small claims lawsuit that plaintiff had filed against him for reimbursement of fees that plaintiff paid to his personal lawyer.[5] When Acosta and plaintiff began the ride-along, the radar detector in plaintiff's car began making noise. Acosta requested that plaintiff turn off the radar detector for the ride-along. Plaintiff refused; he alleges that the radar detector was muted. Plaintiff told Acosta that he did not care if Acosta wrote him up for refusing to turn off the device. Acosta suggested that they end the ride along early and reschedule for a different day. When plaintiff turned the car around, Acosta suggested they try to continue the ride-along. Plaintiff refused, telling Acosta that the ride-along was over, and that he would drop Acosta off where they were--which was some distance from Acosta's hotel, if Acosta wanted. Plaintiff did take Acosta back to his hotel.

Acosta notified Jim Lamb of the events which transpired

---

[5]The claim for attorneys fees stemmed from a 3 hour meeting that plaintiff had with GSK's attorneys on September 18, 2003 regarding his whistleblowing claim. Plaintiff submitted the bill for his attorney's time to GSK for reimbursement. Acosta told plaintiff that he was going to deny the reimbursement request and to report plaintiff for filing a false expense claim. Plaintiff then filed a small claims court claim against Acosta for the attorney's bill. (Declaration of Aldo Davico, Jr. at ¶ 20.

7 Findings and Recommendations

during the ride-along. On November 5, 2003, Mr. Lamb notified plaintiff that he was terminated immediately as a result of his conduct during the October 28, 2003 work session.

Plaintiff filed a wrongful termination action against defendant in the United States District Court for the Central District of California (04-4244) The action was transferred to this court on February 24, 2005.

## DISCUSSION

Defendant contends that it is entitled to summary judgment for the following reasons: (1) plaintiff cannot establish a primae facie case that GSK's adverse employment actions violated Oregon's whistleblowing statute or constituted wrongful termination, and (2) even if plaintiff had established a prima facie case, GSK had a legitimate, non-retaliatory reason for its action.

The parties dispute what frame-work the court should use to evaluate plaintiff's remaining state court claims. Plaintiff argues that, because this court retains jurisdiction based on diversity instead of subject matter jurisdiction, Oregon's prima facie only rule should apply--just as it would in state court. Defendant asserts that the McDonnell-Douglas[6] burden-shifting paradigm applies here.

Federal courts sitting in diversity apply state substantive law and federal procedural law. Gasperini v. Ctr for Humanities, Inc., 518 U.S. 415, 426 (1996). The Ninth Circuit has expressly stated that the McDonnell-Douglas burden-shifting paradigm is a

---

[6]McDonnell-Douglas Corp.v. Green, 411 U.S.792 (1973).

8 Findings and Recommendations

federal procedural rule, which federal courts sitting in diversity must apply when deciding a summary judgment motion. Snead v. Metropolitan Property & Cas. Ins. Co., 518 U.S. 415, 426 (1996). Application of Oregon's prima facie rule in federal court proceedings would only delay the inevitable and would put an increased burden on the federal court's already burdened trial dockets. Snead, 237 F.3d at 1092. Accordingly, the court will apply the McDonnell-Douglas analysis in this matter.

Plaintiff alleges that GSK retaliated against him because he brought national origin complaints against GSK and cooperated in the resolution of these complaints. He also asserts that GSK retaliated against him because he initiated a complaint with the FDA alleging that GSK was engaging in off-label marketing. Plaintiff alleges that GSK engaged in the following retaliatory conduct: (1) reprimanding him on several occassions; (2) denying him a promotion; and (3) terminating him. Third Amended Compl. at ¶ 4.

The Oregon whistleblower statute prohibits an employer from discriminating or retaliating against an employee for initiating or aiding in criminal or civil proceedings. Or. Rev. Stat. § 659A230(1)(2005). Oregon common law prohibits terminating an employee for engaging in protected activity. Moustachetti v. State 319 Or. 319, 877 P.2d 66 (Or.,1994). To establish a prima facie case under either the whisleblowing statue or Oregon common law, plaintiff must show that: (1) he engaged in a protected activity; (2) his employer subjected him to an adverse employment action; and (3) a causal link exists between the protected activity and the adverse action. Ryan v. Patterson Dental Supply,

9 Findings and Recommendations

Inc., 2000 WL 640859, *29 (D Or 2000)(This District applies the Title VII retaliation framework when assessing retaliation claims under the Oregon Whistleblower Act).

A successful presentation of the prima facie case shifts the burden to the defendant "to articulate some legitimate, nondiscriminatory reason" for the disputed action; then, if the defendant carries this burden, the plaintiff has the opportunity to show by a preponderance of the evidence that the proffered reasons are but a pretext for discrimination. McDonnell Douglas, 411 U.S. at 802-03.

There is no dispute that plaintiff's complaint of national origin and race discrimination and allegation that GSK engaged in off-label promotion are protected activities. There is no dispute that GSK reprimanded plaintiff on several occasions, denied him a promotion, and terminated him and that such constituted adverse employment actions. Accordingly, the issue before the court is whether there is any issue of material fact concerning whether a causal link exists between plaintiff's protected activities and GSK's adverse actions against him.

The court finds that plaintiff has not established that GSK had a retaliatory motive when it required plaintiff to meet with his managers on October 16, 2003 and on October 28, 2003. At his deposition plaintiff stated that he believed the October 16 meeting was retaliatory because he "was a great rep, [he] was doing very well, and this was just a manager that wanted to fire [him], and he was receiving support by GSK." Regarding the October 28 meeting, plaintiff did not offer any specific reason why he felt the meeting was retaliatory; he stated that he did

10 Findings and Recommendations

not know or did not remember when questioned about the meeting. The only evidence that these two meetings were motivated by retaliation are plaintiff's statements. Self-serving statements which are uncorroborated by other evidence do not create an issue of material fact. Kennedy v. Applause, Inc., 90 F.3d 1477, 1481 (9th Cir.1996).

The court finds that plaintiff has not established that GSK's motive for the September 29, 2003 memo was retaliation. The memo informed plaintiff that his behavior was grounds for discipline and/or discharge. As with the meetings, plaintiff's only evidence that the memo was retaliatory are his own self-serving statements. During his deposition plaintiff stated that he had no specific evidence that the memo was retaliatory, but suspected that GSK had already decided to terminate him and was using the memo to justify his future termination. Plaintiff's speculations do not raise an issue of material fact. Kennedy, 90 F.3d at 1481.

The court finds that plaintiff has failed to establish a causal connection between his protected activities and the denial of promotion to Neurohealth Clinical Specialist. The two employees who made the hiring decision for this position were not involved in plaintiff's complaints against GSK. Another candidate was selected for the position because he had come to the interview exceptionally well prepared.

The promotion denial was three months after plaintiff's June 2003 protected activities. The Ninth Circuit has indicated that timing alone will not support a causal relationship between a protected activity and an adverse action. Villiarimo v. Aloha

11 Findings and Recommendations

Island Air, Inc., 281 F.3d 1054, 1065 (9th Cir. 2002) (noting that the employment action must come fairly soon after the protected activity). Besides proximity in time, the only evidence plaintiff offers to show that the denial of promotion was motivated by a retaliatory intent is his own statement. Plaintiff stated in his declaration that "no one was better prepared for this position than [he] was" and that he had the best sales record of all the applicants. He also asserts that Ms. Young-Williams was a close friend of Acosta and implies that this friendship affected the hiring. These uncorroborated statements do not raise an issue of material fact. Kennedy, 90 F.3d at 1481.

The court finds that plaintiff has not established a link between his protected activities and his termination. In support of his contention that his termination was retaliatory, plaintiff relies most heavily on the proximity in time between his June 2003 complaints and his November 2003 termination, which is approximately five months. As noted above, to support an inference of retaliatory motive, the employment action must have occurred fairly soon after the protected activity. Villiarimo, 281 F.3d at 1065. In Villiarimo, the Ninth Circuit cited cases from other circuits finding that intervals of four and five months were too long a period to raise an inference of discrimination. Id. at 1065 (citing Filipovic v. K & R Express Sys., Inc., 176 F.3d 390, 398-99 (7th Cir.1999) (four months too long); Adusumilli v. City of Chicago, 164 F.3d 353, 363 (7th Cir.1998) (eight months); Davidson v. Midelfort Clinic, Ltd., 133 F.3d 499, 511 (7th Cir.1998) (five months); Conner v. Schnuck

12 Findings and Recommendations

Markets, Inc., 121 F.3d 1390, 1395 (10th Cir.1997) (four months). A review of the record reveals that plaintiff offers no other evidence to establish that GSK terminated him in retaliation for his protected complaints.[7] Plaintiff has not established an issue of fact concerning whether his termination was motivated by retaliatory intent.

The court finds that plaintiff has not established a prima facie case that any of GSK's adverse employment actions were motivated by a retaliatory intent.

Even assuming arguendo that plaintiff had established a causal connection between the adverse employment actions and his protected activities, the court finds that defendant has offered a legitimate, nondiscriminatory reason for the adverse employment actions; specifically, plaintiff's ongoing violation of company policies and disrespect towards his manager despite being repeatedly advised to cease such behaviors.

It is undisputed that plaintiff engaged in extensive activities "as an employee of defendant GSK, which were illegal, and usually [he] knew they were illegal." (Declaration of Aldo Davico Jr. at ¶ 20.) Plaintiff alleges that he did so because of pressure from GSK's sales management; however, he admits that he engaged in more illegal activity--including presenting off-label promotional programs, than his counterparts. ( Id. at ¶ 7.)

---

[7] Plaintiff's declaration is replete with statements that his manager, Acosta, was jealous of plaintiff's sexual conquests and of his popularity within the GSK sales force and with clients and that GSK pressured him into illegal activities. (Declaration of Aldo Davico, Jr. at ¶ 2 & 6). However, those statements are geared towards explaining why GSK's employment actions were pretexual than establishing a connection between his protected activity and his termination.

13 Findings and Recommendations

Plaintiff was warned by Human Resources that his actions in offering to pay for a client's hair appointment violated company policy. Plaintiff was reprimanded, and admitted that he made a mistake, when he requested promotional items from the marketing department to give away to top clients in exchange for favors.

Further, there is ample evidence that plaintiff treated his manager, Acosta, with disrespect. Plaintiff refused three requests to complete an online training module for processing grant requests, telling Acosta, after the third request, to do it himself. Plaintiff admits that he opened a newspaper during a briefing by Acosta and did not immediately put it away when asked to close it. Plaintiff was warned in September 2003 that he was to treat his manager and peers with courtesy and respect. Plaintiff agreed that this was an appropriate expectation. Plaintiff was counseled about his job performance twice in October 2003.

Despite these warnings, the undisputed evidence shows that, during a ride-along work session with Acosta on October 28, 2003, plaintiff refused Acosta's request to turn off plaintiff's radar detector. Plaintiff told Acosta that he did not care if Acosta wrote him up. Plaintiff refused Acosta's offer to continue the session another day. When Acosta suggested that he and plaintiff could continue the session that day, plaintiff stated that he was done and offered to drop Acosta off "right here," which was some distance from Acosta's hotel. As a result of his conduct during the October 28, 2003 ride-along session, plaintiff was terminated on November 5, 2003.

Plaintiff asserts that all of defendants proffered reasons

14 Findings and Recommendations

for terminating him are pretextual. However, the undisputed material facts support defendant GSK's legitimate nondiscriminatory reasons for its adverse employment actions, including terminating plaintiff. In his declaration, plaintiff attempts to explain or add background to the undisputed facts. For example, plaintiff explains his offering kickbacks to clients in violation of GSK policy by stating that he "forgot to pretend that it was for a medical reason." (Declaration of Aldo Davico Jr. at ¶ 15.) Plaintiff states that his refusal to fill out grant modules when requested "would only seem important to someone who knows nothing about the way that grants were handled in GSK sales....This was a setup to make [him] responsible for a grant application in which [he] had no experience and set [him] up to fail." (Id. at 18.) Plaintiff dismisses the incident where he opened a paper while Acosta was speaking as "an example of the pettiness of GSK's rationale for [his] termination." (Id. at 17.) As previously noted, self-serving statements do not create issues of material fact. Kennedy, 952 F.2d at 266.

The court finds that plaintiff has not established a prima facie case that defendant's adverse employment actions were motivated by retaliatory intent, and even if plaintiff had, defendant has established a legitimate nondiscriminatory reason for its adverse employment actions. Plaintiff has not met his burden of showing that defendant GSK's proffered reasons were pretextual.

///

///

15 Findings and Recommendations

## CONCLUSION

For the foregoing reasons, IT IS RECOMMENDED that defendant's motion for summary judgment be granted in its entirety and this action be dismissed.

These findings and recommendations are submitted to the United States District Judge assigned to this case, pursuant to the provisions of 28 U.S.C. § 636(b)(1). Within ten days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Any reply to the objections shall be served and filed within 10 days after service of the objections. The parties are advised that the failure to file objections within the specified time may waive the right to appeal the District Court's order. See <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

Dated this 2 day of August, 2007.

_____
THOMAS COFFIN
United States Magistrate Judge

16 Findings and Recommendations